Janine Arvizu, CQA<br>
161 Kuhn Dr.<br>
Tijeras, NM 87059

June 4, 2012

Jeffrey R. Edelman
19201 East Mainstreet, Suite 203
Parker, CO 80134
*Transmitted via e-mail*

Subject: Quality Assessment, U.S.A. v. George A. Gaddy (12-cr-00010-MSK)

Dear Mr. Edelman,

As requested, I have attempted to conduct an independent quality assessment of the validity and reliability of controlled substance test results reported by the Drug Enforcement Administration Western Laboratory, the Denver Police Department Laboratory, and the Eastern Nebraska Forensic Lab in the subject case. This letter provides a summary of my conclusions based on the laboratory discoverable materials received to date. The materials that served as the basis for my assessment include the laboratory discoverable materials provided via email from your office, and the following applicable international and national quality standards.

> *General Requirements for the Competence of Testing and Calibration Laboratories*, ISO 17025, 2005
>
> *Guidelines for Forensic Science Laboratories*, ILAC-G19:2002
>
> United Nations Office on Drugs and Crime, Guidelines on Representative Drug Sampling, New York, 2009
>
> United Nations Office on Drugs and Crime, *Implementation of a Quality Management System in Drug Testing Laboratories*, New York, 2009
>
> Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG) *Recommendations*, multiple editions

Using the available documentation and contemporaneous records provided by the laboratories, I attempted to reconstruct the practices, protocols, and results that were relevant to the qualitative and quantitative conclusions regarding controlled substances in the evidence seized in the subject case. I attempted to evaluate the laboratory's actual practices in the subject testing to determine whether they adhered to their own quality requirements, and whether they complied with universally accepted quality standards designed to ensure the quality and reliability of reported test results. However, given the very limited amount of laboratory discoverable material that was made available for review (some items have no discovery at all), it was not possible to determine or evaluate the laboratory's technical requirements applicable to the testing performed, nor was it possible to assess the efficacy of the laboratory's quality controls during the subject testing.

Exhibit "A"

Page 2 of 9
Jeffrey R. Edelman
June 4, 2012

**Incomplete Discoverable Materials**

The discoverable materials received to date does not provide the discoverable materials that are necessary for an independent party to conduct a thorough due diligence assessment of the scientific validity and reliability of the results reported in the subject case. For example, for eighteen items of DEA evidence for which expert opinions are described in the government's 702 submission table, not a single piece of supporting documentation for the opinion was provided; not even a laboratory report was provided, much less the data that served as the basis for the opinions. The documented procedures that the three laboratories should have used to generate their results were not provided. An attachment to this letter provides a list of the materials received to date, as well as a list of the additional items that are needed for an independent assessment of the quality of the reported results.

As required by documentation and recordkeeping requirements in national and international quality standards, a laboratory's reported result must be supported by a comprehensive audit trail of contemporaneous records. From the laboratory's records and documents, it should be possible for an independent party to understand and evaluate the entire analytical process in any given case – who did what to which samples, specifically what instrumental conditions and criteria were used, and all the results that were obtained. The supporting documentation should include information demonstrating the qualifications of the responsible personnel, the calibration status of equipment (e.g., balances, pipettes, etc.) and the traceability of reference materials. Laboratory records should provide an auditable trail that allows an independent party to reconstruct the specific actions, conditions, and decisions that yielded the reported results. This quality principle is the basis for the requested items of discoverable material.

**ISO 17025** 4.13.2.1

"The laboratory shall retain records of original observations, derived data and sufficient information to establish an audit trail, calibration records, staff records and a copy of each test report or calibration certificate issued, for a defined period. The records for each test or calibration shall contain sufficient information to facilitate, if possible, identification of factors affecting the uncertainty and to enable the test or calibration to be repeated under conditions as close as possible to the original. The records shall include the identity of personnel responsible for the sampling, performance of each test and/or calibration and checking of results."

**ILAC G19** 4.12.2.1 a)

"The forensic science laboratory should have documented procedures to ensure that it maintains a coordinated record relating to each case under investigation. The information that is to be included in case records should be documented and may include records of telephone conversation, evidence receipts, descriptions of evidence packaging and seals, subpoenas, records of observations and test/examination results, reference to procedures used, diagrams, print-outs, autoradiographs, photographs, etc. In general, the records required to support conclusions should be such that in the absence of the analyst/examiner, another

Page 3 of 9
Jeffrey R. Edelman
June 4, 2012

> competent analyst/examiner could evaluate what had been performed and interpret the data."

**UNODC 4.9**

> "Each entry of every record should be traceable to the analyst/examiner and, where appropriate, to a uniquely identified case or exhibit. It should be clear from the case record who has performed all stages of the analysis/examination and when each stage of the analysis/examination was performed (for example, the relevant dates). All records should contain sufficient information to allow an audit trail to be established showing who did what work and how and when it was done."

> "In general, the records required to support conclusions should be such that, in the absence of the analyst/examiner, another competent analyst/examiner could evaluate what had been performed, interpret the data and, where appropriate, repeat the work. When a test result or observation is rejected, the reason(s) should be recorded. This information is necessary for another analyst to understand how the case was managed."

**SWGDRUG 9.1**

> " Documentation shall contain sufficient information to allow a peer to evaluate case notes and interpret the data. Evidence handling documentation shall include chain of custody, the initial weight/count of evidence to be examined (upon opening), information regarding packaging of the evidence upon receipt, a description of the evidence and communications regarding the case. Analytical documentation should include procedures, standards, blanks, observations, test results and supporting documentation including charts, graphs and spectra generated during an analysis. Casework documentation shall be preserved according to documented laboratory policy."

**Data Quality Assessment**

Three areas that must be evaluated for a data user to assess the quality and usability of a laboratory's reported results: sample integrity, method validity, and reliability of analysis.

**Data Quality Assessment – Sample Integrity**

The first issue to be addressed in a data quality assessment is the integrity and representativeness of the evidence samples that were subject to analysis. The reliability of any laboratory's reported results are inherently limited by the integrity and representativeness of the samples that were tested by the laboratory. If the evidence or the derived analytical samples were collected, identified, packaged, stored, or tested in such a manner that the identity or the quality of the sample was compromised, the laboratory's results should not reliably be considered to represent the originally seized evidence.

Based on the limited discoverable material received to date, it was not possible to correlate the evidence tested by the laboratories with the evidence seized in the field. Neither was it possible to identify the sampling approach or the assumptions used by the laboratories to identify, select, and prepare discrete or composite analytical samples from the packaged units of evidence.

Page 4 of 9
Jeffrey R. Edelman
June 4, 2012

### Data Quality Assessment – Method Validity

In an evaluation of data quality, the scientific validity of the test methods used is the next issue to be assessed. Method validation is the means through which a laboratory determines whether a given analytical method is appropriate for its intended use. A method validation study is a formal process through which the performance characteristics of a method are empirically determined (e.g., accuracy, precision, selectivity, linearity, representativeness, detection limit), so they can be compared to standards for the intended use of the method. For the forensic controlled substance testing reported in the subject case, before testing unknown samples, validation should have been performed to empirically assess whether each of the laboratories' procedures can unambiguously identify and quantify (as appropriate to the laboratory's results, to a known degree of confidence) cocaine.

In the subject case, the three laboratories apparently used different analytical methods for qualitative identification of cocaine (the methods used by the DEA laboratory were not described on their reports). Only the DEA laboratory reported quantitation of the amount of cocaine present, and the method used for quantitation was not described on their reports. The validity of the analytical methods that were used by laboratories for qualitative and quantitative analysis could not be evaluated, because the laboratories' written procedures (which are required by applicable quality standards) and validation results were not included with the discoverable material.

- **ISO 17025:**

  5.4.5.1 "Validation is the confirmation by examination and the provision of objective evidence that the particular requirements for a specific intended use are fulfilled."

  5.4.5.2 "The laboratory shall validate non-standard method, laboratory-designed/developed methods, standard methods used outside their intended scope, and amplifications and modifications of standard methods to confirm that the methods are fit for the intended use. The validation shall be as extensive as is necessary to meet the needs of the given application or field of application. The laboratory shall record the results obtained, the procedure used for the validation, and a statement as to whether the method is fit for the intended use. Note 1: Validation may include procedures for sampling"

- **ILAC G19:** 5.4.2

  "a) All technical procedures used by a forensic laboratory should be fully validated before being used on casework.

  b) Where a laboratory introduces a new (validated) method, it should first demonstrate the reliability of the procedure in-house against any documented performance characteristics of that procedure. Records of performance verification should be maintained for future reference."

- **UNODC:** 5.5

"All methods, including non standard/in-house methods, must be validated or verified to demonstrate that they are fit for purpose and will perform in the laboratory's operational environment. All validations and verifications must be carried out according to the laboratory's approved procedure and be fully documented. Validation is the confirmation by examination and the provision of objective evidence that the particular requirements for a specific intended use are fulfilled. Validation should be as extensive as is necessary. Guidance on what is appropriate under different circumstances and for different methods can be found in many publications (for example, *UNODC Guidelines on Validation of Analytical Methodology and Calibration of Equipment used for Testing of Illicit Drugs in Seized Materials and Biological Specimens,* and the references therein). Verification is similar to validation but is used when a method has been validated elsewhere and shows that it performs to the required specification in the hands of the laboratory staff."

### SWGDRUG:

1.2 "An analytical scheme shall be comprised of validated methods that are appropriate for the analyte."
1.2.1 "The combinations of methods chosen for a particular analytical scheme shall identify the specific drug of interest, preclude a false positive and minimize false negatives."
1.2.2 "For quantification the method should reliably determine the amount of analyte present."
1.2.3 "If validated methods are used from published literature or another laboratory's protocols, then the methods shall be verified within each laboratory."
1.4 "All methods shall be validated or verified to demonstrate that they will perform in the normal operational environment when used by individuals expected to utilize the methods on casework."

### Data Quality Assessment – Reliability of Analysis

After assessing the integrity of samples and the validity of the testing method, the reliability of a laboratory's results should be evaluated. Reliability of analytical results is dependent upon the scope and efficacy of a laboratory's quality assurance program. While validation is used to determine whether a laboratory's method is appropriate in theory, reliability is assessed by considering whether the laboratory implemented a scientifically valid method in an acceptable, and scientifically controlled manner. Even though a laboratory uses a scientifically valid method, reliability of results is not assured.

In the subject case, the lack of supporting records and documents made it impossible to assess the efficacy of the three laboratories' quality systems to produce reliable results. Nevertheless, even from the very limited available documentation, significant technical deficiencies were identified in the reported results.

<u>Eastern Nebraska Forensic Lab</u>: A total of only six pages of records were provided in support of work in this case performed by the Eastern Nebraska Forensic Lab. One copy

Page 6 of 9
Jeffrey R. Edelman
June 4, 2012

of the laboratory's one page form (it includes both receiving information and the analyst's reported results) has been signed by the analyst, and a second copy of the same form has been notarized, suggesting that the notary may not have witnessed the signature.

The Nebraska report provides results that are described as coming from "various tests." A separate unsigned, undated sheet of paper purportedly provides a sequential narrative of the testing process, but there is no evidence who prepared the description, or whether it was prepared at the time of the subject testing.

The Nebraska laboratory also provided a two page resume for the responsible analyst, Christine Reisen. The only other document provided by the Nebraska laboratory is a one page summary of testimony dated April 12, 2012. This very short document contains two technical errors that suggest a weak quality system. First, item 5 reports the identification of the active drug ingredient as cocaine hydrochloride, but does not provide a purity for the cocaine. An notation states that "no qualitative results were requested." In fact, the laboratory performed and reported a qualitative result. This statement should have read that "no quantitative results were requested." The second error describes the instrumental analysis performed on the sample as "Fourier Transfer Infared spectroscopy (FT-IR)." The analytical technique is actually "Fourier Transform Infrared Spectroscopy (FT-IR)." Fourier transform is a mathematical transformation that is applied to raw data to generate an infrared spectrum.

DEA Western Laboratory:

The government's 702 summary itemizes a total of 28 items of evidence that were purportedly analyzed in the DEA Western Laboratory; 7 of the items were described as analyzed by Cinco Roehl and the remainder were described as analyzed by Minh Nguyen. The discoverable material provided in this case includes completed DEA-7 forms (Report of Drug Property Collected, Purchased, or Seized) and Laboratory Reports (DEA-113) for only 14 of the 28 items of evidence described in the government's 702 summary. Neither receiving records nor laboratory reports were provided for the other 14 items of evidence. In addition, the underlying data that served as the basis for the laboratory's conclusions were not provided for any of the evidence reported as tested by the DEA laboratory. As a result of the fact that none of the essential data were provided, it isn't possible to verify that the subject testing was even performed, much less to determine whether the laboratory's results were reliably generated in accordance with international standards.

It is also noted that the DEA laboratory provided a written Summary of Testimony prepared by Minh Nguyen (dated 4/20/2012), but the items of evidence described in this letter (ATF exhibits 164, 17-1, 17-2, and 17-3) were not included on the government's summary table of disclosures, and no records or documents related to the referenced items of evidence have been received.

Denver Police Department Laboratory:

The Denver Police Department Laboratory discoverable material provided in the subject case included the batch instrumental data for the testing of five items of evidence performed using FT-IR and GC-MS methods. However, despite the fact that the analyst's

Page 7 of 9
Jeffrey R. Edelman
June 4, 2012

summary of testimony describes the results as having been generated "in compliance with the established procedures of the Denver Police Crime Laboratory," the procedures were not provided. As a result, it was not possible to determine the laboratory's criteria for qualitative identification of a controlled substance. This is particularly relevant in this case since the IR testing of 305862-1 was documented as negative for cocaine, yet the analyst's summary of testimony reports this item as containing cocaine HCl, based on determinations made by GC-MS and IR. From review of the available discoverable materials, it was also evident that the DPD laboratory's reported results do not include an empirically determined uncertainty, and are not traceable. Determinations of uncertainty and traceability are requirements of applicable international quality standards that are designed to ensure the reliability of laboratory results.

**Conclusions**

In recent years, the scope and severity of problems in the forensic science system have become a matter of public record. The summary of the recent report issued by the National Research Council (Strengthening Forensic Science in the United States: A Path Forward, 2009) stated "In short, the quality of forensic practice in most disciplines varies greatly because of the absence of adequate training and continuing education, rigorous mandatory certification and accreditation programs, adherence to robust performance standards, and effective oversight." In consideration of these deficiencies, users who need to understand the uncertainty of forensic results must exercise the due diligence to conduct quality assessments of reported results.

Even under optimum conditions, analysis of an unknown material always involves a degree of uncertainty; an error rate of zero is a scientific myth. It is a matter of due diligence for any data user to ensure that they understand the integrity of the evidence, the validity of the test methods that were used, and the reliability of results that are proposed for introduction as evidence. This is done by reviewing the underlying data and supporting documentation that formed the basis for a laboratory's reported results. In accordance with national and international quality standards, supporting information should be sufficiently detailed and complete so as to enable an independent reviewer to understand all assumptions and conclusions, and to reconstruct the sequence of events and activities, computations, and decisions of the entire analytical process, from sampling through analysis and reporting.

The discoverable materials that have been received to date in this case are insufficient for an independent quality assessment. In the absence of additional discoverable materials, these materials do not support a conclusion that the casework was valid and reliable.

Should you have questions, please do not hesitate to contact me.

Very truly yours,

Janine S. Arvizu
Attachment: As stated

Page 8 of 9
Jeffrey R. Edelman
June 4, 2012

**Materials Received to Date**

Eastern Nebraska Forensic Lab:

>   Inventory of Evidence Submitted (2 copies, one of which was notarized)
>
>   Unsigned, undated narrative description of testing
>
>   Christine Reisen resume
>
>   Summary of Testimony, dated 4/12/2012

Drug Enforcement Adminsitration Western Laboratory

>   Summary of Testimony, from Minh Nguyen, dated 4/20/2012
>
>   Summary of Testimony, from Roehl Cinco, dated 3/22/2012
>
>   Summary of Testimony, from Minh Nguyen, dated 3/22/2012 (two copies, one with additional information and items of evidence; no indication of which is the final version)
>
>   DEA Form 7s, exhibits 29, 30, 32; 34; 45, 46, 47; 48, 49; 54, 55, 56; 58, 59
>
>   Laboratory Reports exhibits 29, 30, 32; 34; 45, 46, 47; 48, 49; 54, 55, 56; 58, 59
>
>   Roehl Cinco resume
>
>   Minh Nguyen resume

Denver Police Department Laboratory

>   Summary of Testimony, unsigned and undated
>
>   Casefile review sheet, laboratory report, requests for examination, and internal custody records
>
>   Casefile, including: worksheets, FT-IR instrument output, and GC-MS instrument output
>
>   Stephen Sassetti resume

**Materials Needed for Data Quality Assessment (from all three laboratories):**

>   Field records regarding evidence collection
>
>   Laboratory quality documentation
>
>>   *From the DEA laboratory specifically: the Laboratory Operations Handbook, the Analytical Sufficiency Document, and the Analysis of Drugs Manual.*
>
>   Records from internal and external audits
>
>   Inventory of capital instrumentation
>
>   Laboratory sampling procedures

- Laboratory procedures for qualitative and quantitative determination of cocaine
- Internal custody records (already provided by DPD laboratory)
- Proficiency results for Stephen Sassetti, Roehl Cinco, Minh Nguyen, and Christine Reisen
- Qualification records for Stephen Sassetti, Roehl Cinco, Minh Nguyen, and Christine Reisen
- Case-specific laboratory communication records
- Documentation of current status of case evidence
- Method validation results
- Instrument run logs for days of subject testing
- Instrument tuning and calibration records
- Traceability documentation for standards and controls
- Instrument maintenance and repair records
- Reagent records
- Records used to monitor method performance (e.g., control charts)
- Raw and processed data for each batch that included subject samples (include data for ALL samples in the batch; DPD laboratory data have already been reported)
- Traceability records for balances and pipettes
- Records of nonconformances regarding controlled substance testing
- Records of independent reviews of subject case work (already provided by DPD laboratory)
- Contamination control and environmental monitoring records

## Janine S. Arvizu
161 Kuhn Drive, Tijeras, NM 87059

### EXPERIENCE SUMMARY
Janine Arvizu is a chemist and laboratory quality expert with more than 25 years of technical and program management experience in laboratory operations and management, quality assurance, and interdisciplinary analytical programs. She has developed and managed organizational and programmatic quality programs, and has extensive experience in the assessment of laboratory operations and analytical programs.

### RELEVANT EMPLOYMENT HISTORY
<u>Senior Technical Consultant, Consolidated Technical Services, Inc.: Independent contractor: 1992-present.</u> Ms Arvizu provides consulting services in laboratory assessment, quality assurance, and independent reviews. She is an experienced Lead Auditor for assessments of testing laboratories under a variety of standards, including ISO. Ms. Arvizu served as Program Manager for Navy's analytical QA program that evaluated laboratories nationwide, and provided independent technical reviews and quality assessments of major project plans and laboratory results.

<u>Scientific Specialist, EG&G Idaho, detail assignment to Department of Energy, 1990-1991.</u> Ms. Arvizu provided technical support to interdisciplinary quality program development and long range planning for laboratory support to DOE. Ms. Arvizu was a technical representative for DOE on interagency quality issues, and served as a technical resource on analytical and laboratory issues within the DOE complex, with other federal agencies, and with the private sector.

<u>Unit Manager (ending position). EG&G Idaho. DOE's Idaho National Engineering Laboratory, 1981-1990.</u> Ms. Arvizu established and managed one of the first full service analytical testing laboratories with broad radiological handling capabilities. She directed method development and validation, managed quality initiatives, and directed analytical support for national analytical programs.

### AREAS OF EXPERTISE
Strong theoretical and practical experience in prescriptive and performance-based Quality Assurance; design and execution of system, laboratory, and data audits; quality standards for laboratory operations, laboratory accreditation and proficiency testing programs (ISO 25, 17025, 43-1, 43-2, and 58)

Production laboratory operations, management, and assessment; method validation; interdisciplinary program support and independent oversight of testing programs

---

- Education

ABD Chemistry, University of New Mexico

B.S. Biochemistry with honors; California Polytechnic State University, San Luis Obispo, 1976

- Qualifications and Skills

Certified Quality Auditor (ASQ #19856)

Trained ISO Lead Auditor (ISO 9000, 17025)

Development and assessment of laboratory quality programs

Development and assessment of prescriptive and performance-based analytical QA programs

System, technical, and data audits of laboratories and measurement programs

Management and operation of production laboratories

Independent assessment of interdisciplinary measurement programs

Identification and investigation of fraudulent laboratory practices

Data quality assessment and data rescue

Quality assurance training of laboratory personnel and data users

DOE Q clearance (inactive)

Janine Arvizu

## PROFESSIONAL EXPERIENCE

### Quality Programs

- Developed and authored the Quality standard for testing laboratory support to Navy's Installation Restoration Program. Served as Program Manager for the Quality Assurance Program. Directed the revision of the program to comply with ISO Guide 25. Managed the independent evaluation of ~70 testing laboratories nationwide, using on-site audits, reviews of quality documentation, and blind proficiency testing. Made final recommendations for laboratory approval.

- Personally planned and served as Lead Auditor for quality systems audits and technical audits of dozens of testing laboratories (commercial and federal); included reviews of analytical chemistry, bioassay, radioanalytical, and research laboratories. Evaluated compliance with laboratory quality standards, including Good Laboratory Practices and ISO/IEC elements.

- For large federal projects involving millions of dollars of analytical work, evaluated the technical and production capabilities of proposed laboratories in relation to project-specific technical and quality objectives. Evaluated the technical acceptability of proposed sample preparation and determinative procedures, and assessed the validity of the laboratory's method validation.

- Conducted independent quality assessments of results reported by governmental and commercial forensic laboratories; areas reviewed include: sampling, toxicology, controlled substances, trace evidence, serology, DNA, blood alcohol, and gunshot residue. Provided testimony as required.

- Designed a comprehensive quality program for a new radiological handling analytical laboratory; directed preparation, review, approval, and implementation of quality and operating procedures.

- Coordinated the collection of split referee samples during the investigation of criminal environmental practices at the Rocky Flats Plant.

- Provided technical reviews of Quality Assurance Project Plans and Sampling and Analysis Plans for characterization programs at federal sites nationwide; evaluated compliance with applicable quality requirements.

- During the course of on-site audits, identified evidence of fraudulent practices and misrepresentation by analytical laboratories. Provided technical support to a federal investigation of fraudulent laboratory practices by reviewing contract files and raw data for supporting evidence.

- Planned and conducted "special" and unannounced on-site audits in response to serious data quality concerns or project-specific requirements. Planned and conducted data quality assessments.

- For the Department of Energy, chaired an independent Advisory Panel for the high level tank waste characterization program at Hanford; coordinated interdisciplinary Panel reviews of management, programmatic, quality, sampling, and laboratory issues; coordinated Panel activities with the National Academy of Sciences subcommittee reviewing the tank program, and with Defense Nuclear Facilities Safety Board findings.

- Conducted and directed technical reviews and data quality assessments for large data sets (thousands of samples for dozens of parameters) from large measurement programs. Data subject to review included routine (trace level organics and inorganics, classical testing) analytical measurements, as well as radiochemistry, fuels, alkyltins, high explosives, and other unusual parameters. Identified computational errors with major quality impact in data sets that had already been "passed" by checklist data validation. Identified serious data quality problems, including false positives and false negatives.

- Testified as a laboratory quality assurance expert witness in federal, state, and international courts.

- Co-chaired (as DOE's representative) an annual interagency (DOE/DOD/EPA) analytical quality assurance conference.

Janine Arvizu

- Provided or managed independent reviews of numerous remediation project planning and reporting documents for federal sites nationwide. Assessed project data quality requirements to determine whether they were acceptable and achievable. Evaluated proposed analytical strategies to determine whether they would satisfy project objectives. Reviewed proposed analytical methods and specified QC criteria. Identified and reported deficiencies, omissions, and opportunities for improvement. Identified flawed sampling strategies and technically inappropriate sampling or analytical procedures.

- Planned and directed the initial development of a DOE-wide sampling, analysis, and quality assurance plan for characterization of transuranic wastes destined for emplacement in the Waste Isolation Pilot Plant (WIPP). The resulting Quality Assurance Program Plan was accepted without comment by EPA-HQ; the QA Program was technically rigorous and performance-based.

Laboratory Operations and Systems

- For the Department of Energy, established and managed one of the first full service analytical testing laboratories that handled radiologically contaminated samples. Responsible for overall laboratory management, including production, quality, safety, environmental and radiological controls; acquisition, maintenance, and management of staff, instrumentation, and new and renovated laboratory facilities.

- Designed and implemented a concise, electronically generated data reporting format to streamline technical reviews of large quantities of laboratory quality control data, and to allow effective integration and interpretation of instrument and method performance data with field data collected under related spatial or temporal conditions.

- Chaired analytical subcommittee supporting the Department of Energy in the identification and prioritization of environmental problems at DOE sites across the country.

- Founded and chaired the Department of Energy's Future Analytical Support Team chartered with developing a strategy to ensure adequate capacity of high quality analytical services; identified and assessed critical analytical and quality issues impacting analytical support.

- Conceived, planned, and managed a comprehensive and statistically valid effluent monitoring program for characterization and long-term monitoring of radioactive, process, and operational discharges from nuclear and production facilities at a large federal site

- Developed sampling and analysis plans for characterization of chemical and radiological contaminants in airborne discharges, waste sites, process effluents, groundwater, and surface soils

- For DOE-HQ, conducted a study of alpha-handling laboratories to determine which site would best be able to provide transuranic analytical services; evaluated facilities, instrumentation, staffing, data management systems, permitting and compliance, and infrastructure issues.

- Directed the acquisition, installation, and testing of more than $1 million in laboratory instrumentation, including development of performance specifications and determination of operational performance characteristics.

- Served as technical advisor to DOE Source Evaluation Panel considering proposals to provide technical support and analytical services associated with TRU waste characterization; provided detailed review of technical proposals; conducted on-site technical assessments of each laboratory in the competitive range; evaluated Best and Final Offers for adherence to technical criteria.

- Developed and presented quality assurance courses and workshops to provide continuing education and training for laboratory technicians, engineers, scientists, lawyers, and judges. Subjects included: quality assurance, quality control practices, contamination control, data quality assessment, laboratory audits, characterization strategies, and field quality control practices.

## Discoverable Materials List – Controlled Substances

### Materials from the agency(ies) responsible for sample collection and transportation:

- All field records related to evidence collection and ambient environmental conditions*
- Relevant training records for evidence collection personnel, including training materials
- Diagrams, descriptions, or photographs of evidence at all stages: collection, packaging, storage, and transportation
- Case intake and evidence control records (e.g., custody records, temporary storage documentation, laboratory analysis request forms, evidence inventory forms, shipping receipts)*
- Records related to field screening, including manufacturer, model, lot number, expiration date, contents, and performance specifications of field kit

### Materials from ASCLD-LAB Accredited Laboratories:

- Most recent ASCLD-LAB application for accreditation
- Statements Of Qualification for key personnel
- Most recent Accreditation Review Report
- Grade computation sheets and final accreditation report

### Materials from each laboratory responsible for sample testing:

NOTE: Laboratory quality documentation provided should be the versions that were in effect at the time the subject work was performed

- Laboratory Quality Policies and Manual (however named)*
- Laboratory Protocols (i.e., prescribed minimum testing for identification of a particular compound or class of compounds)
- Laboratory technical procedures (often called Standard Operating Procedures; detailed operating procedures for each analytical method used in the subject case)*
- Laboratory Quality Procedures (however named; implementing procedures for the quality program. e.g., internal audit procedures, training and qualification procedures, contamination control procedures, document control procedures, etc.)*

    Note: If formal procedures are not available, provide copies of relevant memos, instructions, or guidelines to lab personnel.

- Floor plan of the laboratory facility, with functional areas identified (evidence storage, sample preparation, GC-MS instrumentation, standard preparation, analyst offices)
- Number of laboratory staff members (number of management, technical, and support staff) assigned to work in the laboratory at the time the subject work was performed
- Records of the scope and schedule for internal and external laboratory audits
- Copies of internal audit reports generated during the years prior to and after the subject testing, and external audit reports received during the years prior to and after the subject testing*
- Inventory of laboratory capital equipment (make/model/acquisition date)
- Laboratory procedures for sampling of evidence, including (as appropriate to the subject case): procedures and criteria for determination of sample population, basis for development of statistical or non-statistical sampling plan, methods for assessment and achievement of homogeneity, sample reduction practices, and documentation of sampling events and decisions.*
- Case intake and evidence control records (field-to-lab custody transfers, intra- and inter-laboratory chain of custody, evidence receipt log, assignment of laboratory identifiers, controlled storage temperature records for evidence)*
- Statement of Qualifications or résumé for each analyst with responsibility for the subject testing (including preparation technicians and technical reviewers)*
- Internal and external proficiency results (actual and reported results, and all relevant records, data, and correspondence) for each analyst and each method used on the subject case, for five years surrounding testing (unless the analyst has been conducting the subject testing at the laboratory for less than five years)
- Records demonstrating the qualifications of the responsible analyst(s) and technical reviewer in the subject case; include a copy of employment applications, academic transcripts, disciplinary files, training records, and personnel files (redaction of personal information from the requested public records is acceptable)
- Interim and final report(s) issued by the laboratory (including amended reports and records of informal verbal reports, as appropriate)*
- Records of internal and external communication related to the subject case, including copies of faxes, telephone record logs, internal correspondence, or any other records
- Records of procurement and receipt of laboratory gloves during the year prior to the subject casework.
- Documentation of the disposition of tested case samples; include documentation of the interim storage condition and current status of any untested case samples

<u>**For each test method, as appropriate:**</u>

- Results from validation studies for each method used to analyze evidence (i.e., copy of the complete validation file, including assumptions, data, results, and conclusions);

if the laboratory relies on external validation, provide a reference, and a copy of the empirical verification data generated by the laboratory

- Copies of bench notes, log books, communication logs, and any other records pertaining to case samples or instruments; records describing the condition of the evidence *
- Copies of records documenting observations, diagrams, notations, or measurements regarding case samples or testing*
- Records documenting any deviations from the laboratory's approved Standard Operating Procedures or Quality Manual that occurred during testing of the subject case samples
- Instrument run logs for the instrument(s) used on case samples on the day(s) case samples were tested (including identification of all unknown samples and controls)*
- Instrument tuning and calibration records (e.g., as prepared, and as determined values for initial and continuing calibrations applicable to case samples; as prepared and as determined values for second source calibration check samples; verification of internal standards) for analytical instruments used to perform subject testing*
- Source, preparation and usage records demonstrating traceability and shelf life for standard materials and solutions used for calibration and quality control (including unique identifications, origins, dates and details of preparation and use, composition and concentration of prepared materials, supplier certifications, shelf lives of parent and stock solutions)*
- Documentation of the laboratory's storage conditions for the standards and controls used in the subject casework, for the period from the initial date of receipt through the date of the subject analysis; include a procedure describing practices for storing standards and controls (if available); include a description of the materials that are co-located with standards and with unknown samples
- Contemporaneous records documenting preparation of all solutions, standards, and controls used in the batch in which the subject case samples were tested*
- Records documenting the verification of the standards and controls used in the batch in which the subject case samples were tested; for both purchased and prepared solutions, provide verification data for testing performed prior to use*
- Instrument maintenance and repair records for at least three months surrounding case testing
- Source, preparation, and usage records for reagents and materials used during testing
- Control charts used to monitor instrument or method performance during the period in which case samples were processed
- Raw and processed data for each batch that included case and associated QC samples, including all data excluded by analyst*

Note: In addition to hard copies of data, a read-only copy of the electronic data should be requested if the reviewer has access to the necessary processing software.

- As prepared and as determined values for all blanks, replicates and controls included in batches with case samples*
- For quantitative analysis (as appropriate): documentation verifying compliance with calibration criteria for volumetric and gravimetric equipment (e.g., variable or fixed volume pipettes, analytical balances)*
- Copies of nonconformance reports (however named) for issues with the potential to adversely impact the reliability of case samples or results*
- Records of the scope and performance of internal independent reviews (technical and administrative) of case results
- Results of environmental monitoring for parameters relevant to test methods
- Documentation of sampling plans and results of contamination control surveys for species relevant to test methods used in the subject case*